Kiley L. Grombacher
Bradley Grombacher, LLP
31365 Oak Crest Drive, Suite 240
Westlake Village, CA  91361
Kgrombacher@bradleygrombacher.com
Telephone:  805-270-7100
Facsimile:  805-270-7589

Daniel J. Thornburgh (*pro hac vice*)
Aylstock, Witkin, Kreis & Overholtz, PLLC
17 East Main Street, Suite 200
Pensacola, FL 32502
dthornburgh@awkolaw.com
Telephone: 850-202-1010
Fax: 850-916-7449

*Counsel for Plaintiff, Edmond Rambod*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

EDMOND RAMBOD,

                Plaintiff,

v.

ANNA MHATRE, INFINIWEB
TECHNOLOGY, INC. and
ITECHNO SPECIALIST, INC.

                Defendants.

Case No. 2:24-cv-07215-AH(BFM)

**FIRST AMENDED COMPLAINT FOR VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT**

Plaintiff, Edmond Rambod, by and through undersigned counsel, sues Anna Mhatre, Infiniweb Technology, Inc. and ITECHNO Specialist Inc., as follows:

## **PRELIMINARY STATEMENT**

1.     This action arises from a sophisticated international cryptocurrency fraud and money laundering scheme, commonly known as a "pig butchering" scam, which resulted in the theft of Plaintiff Edmond Rambod's digital assets valued at over $2.2 million USDT. The scheme was perpetrated by Defendant Anna Mhatre a/k/a Anna Khalid, her cohorts, and a network of criminal organizations operating through a complex web of cryptocurrency wallets and exchanges.

2.     Recent investigations by the United States Department of Justice ("DOJ") and the United States Secret Service, as detailed in a Verified Complaint for Forfeiture In Rem filed in the United States District Court for the District of Columbia (Case No. 1:25-cv-01907), have traced the proceeds of cryptocurrency confidence scams through a network of at least 144 OKX exchange accounts and hundreds of intermediary wallets. The DOJ's action resulted in the seizure of approximately 225,364,961 USDT held in seven wallets on the OKX platform.

3.     Plaintiff's own blockchain tracing using the First In First Out (FIFO) method confirms that Mr. Rambod's stolen cryptocurrency was laundered through 39 wallets that were also identified in the DOJ's Verified Complaint or its exhibits[1]. These wallets are part of the same laundering network targeted by the DOJ's forfeiture action.

---

[1] Cipherblade, an independent blockchain expert retained by Plaintiff used the Last In First Out (LIFO) method which showed at least 8 wallets matching the wallets identified in the DOJ's Verified Complaint or its exhibits.

4.      The DOJ's Verified Complaint and supporting evidence identify Infiniweb Technology, Inc. ("Infiniweb") as the owner of five of the seized wallets, which collectively held tens of millions of USDT in criminal proceeds. Infiniweb has appeared in the DOJ's forfeiture action and filed a Verified Claim asserting an interest in the seized assets.

5.      The DOJ's investigation further identifies ITECHNO Specialist Inc. ("ITECHNO") as a key participant in the scam and laundering operation. ITECHNO operated out of a scam compound in the Philippines, employing forced labor to perpetrate cryptocurrency confidence scams and launder victim funds.

6.      Plaintiff brings this amended action to add Infiniweb and ITECHNO as defendants, based on their involvement in the theft and laundering of Plaintiff's assets as established by the DOJ's findings and Plaintiff's tracing analysis.

7.      Defendants stole cryptocurrency from Plaintiff in the amount of 2,230,410.1801 Tether (USDT) pursuant to a sophisticated global internet cryptocurrency fraud and conversion scheme.[2]

8.       Infiniweb and ITECHNO, along with an individual who called herself "Anna Mhatre" played a material role in the theft of Plaintiff's assets, and they and their co-conspirators currently possess all or a significant portion of Plaintiff's stolen property.

---

[2] Tether (USDT) belongs to a subset of digital assets called stablecoins. Stablecoins are anchored or "pegged" to less-volatile assets. In the case of USDT, it is pegged to the U.S. Dollar. Thus, 1 USDT equals approximately $1 USD.

9.     Plaintiff brings this lawsuit to recover his stolen assets.

## **SUBJECT MATTER JURISDICTION AND VENUE**

10.     This is an action for damages related to the theft of Plaintiff's cryptocurrency assets as detailed below. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 (diversity jurisdiction). This action includes damages pursuant to 18 U.S.C. § 1964 (the "Racketeer Influenced and Corrupt Organizations Act" or "RICO"). This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question).

11.     Venue is proper in this District pursuant to 18 U.S.C. § 1965(a) and (b), and 28 U.S.C. § 1391(b) and (c).

12.     Defendants are subject to personal jurisdiction in this district, because they direct business activities toward and conduct business with consumers throughout the United States, including within the State of California and this district through at least a fraudulent website (coinrule-web3.net) which can be accessed on the internet and on smartphones and are accessible from California.

13.     As detailed more fully in paragraph 20-50 and incorporated herein, Plaintiff accessed the fraudulent website (coinrule-web3.net) in the State of California, Defendants directed numerous false and fraudulent representations to Plaintiff while in California and within this district, and the theft occurred while Plaintiff was located in the State of California and caused significant harm to Plaintiff in this district.

## THE PARTIES

14. Plaintiff, an individual, is *sui juris*, and is a resident and citizen of California.

15. Defendant Anna Mhatre is an individual whose true identity is presently unknown. Defendant Mhatre represented to Plaintiff that she was residing at 514 N. Peshtigo Court, Chicago, IL.

16. Defendant Infiniweb Technology, Inc. is a corporation registered in the British Virgin Islands. According to the DOJ's Verified Complaint and Infiniweb's Verified Claim, it is the owner all seven of the cryptocurrency wallets seized by the DOJ, which collectively holds more than 225 million USDT in criminal proceeds.

17. Defendant ITECHNO Specialist Inc. is a company organized under the laws of the Philippines. DOJ filings identify ITECHNO as operating a scam compound in the Philippines and laundering victim funds, including, upon information and belief, Plaintiff's stolen cryptocurrency.

18. Defendant Mhatre, Infiniweb and ITECHNO Specialist Inc. and are participants in the criminal enterprise described herein.

19. At all times material hereto, Defendants have maintained and continue to maintain private cryptocurrency wallets and cryptocurrency exchange accounts in which all of or a portion of Plaintiff's stolen cryptocurrency currently sits.

## ALLEGATIONS COMMON TO ALL COUNTS

**A. Defendants Execute an International Cryptocurrency Theft Scheme**

20.     Plaintiff is a victim of not only a nationwide but also a worldwide RICO conspiracy known as "pig butchering."

21.     Pig butchering scams are "fraudulent crypto investment schemes directed from Asia," which are now a billion-dollar industry.[3]

22.     Pig butchering scams run and perpetrated by organized criminal groups in Southeast Asia, are called such because the victims are "likened to hogs fattened up for slaughter."[4]

23.     The scammers, typically located in Southeast Asia, carefully research their victims and can spend months grooming the victim to gain their trust.

24.     Pig butchering scammers utilize expertly crafted copycat websites that replicate authentic trading platforms. These scammers simulate trades and returns and the victims are unaware of the scheme.[5]

25.     The perpetrators of these so-called pig butchering scams befriend victims and over time build up trust. Once that trust is gained, the perpetrators claim to be experts in cryptocurrency investments, fraudulently represent themselves to be experts in cryptocurrency investing, and convince victims to send their digital assets to fake copycat exchanges.

---

[3] https://www.reuters.com/investigates/special-report/fintech-crypto-fraud-thailand/
[4] https://www.nbcnews.com/news/crime-courts/pig-butchering-scams-rise-fbi-moves-stop-bleeding-rcna137009
[5] https://www.reuters.com/investigates/special-report/fintech-crypto-fraud-thailand/

26. Plaintiff had no experience trading cryptocurrency prior to being approached by Defendant Mhatre.

27. On or about May 30, 2023, Plaintiff was contacted via LinkedIn by a woman identifying herself as "Anna Mhatre". Plaintiff accepted her invitation to connect.

28. On or about on June 9, 2023, Defendant Mhatre reinitiated contact, providing Plaintiff with her cell phone number, email address, and a physical address at One Bennett Park Luxury Apartments, 514 N. Peshtigo Ct, Chicago, IL 60611. She claimed her date of birth was November 2 and that she was approximately 34–35 years old.

29. Communication between Plaintiff and Defendant Mhatre occurred through WhatsApp with WhatsApp texting to her purported number 773-253-4792, via email (annamhatre1102@gmail.com), several phone calls, and Skype video calls (one of which Plaintiff recorded).

30. Defendant Mhatre misrepresented that she would teach Plaintiff how to become a successful cryptocurrency trader.

31. Defendant Mhatre lured Plaintiff by showing him examples over WhatsApp of how she was successfully earning high returns on her cryptocurrency trading methods. She claimed that her father was a public figure in Chicago who advised her on short-term binary trading and that her godfather was David Tepper, a famous hedge fund manager who would provide guidance so she could help Plaintiff invest in cryptocurrency.

32.     Over several weeks, Defendant Mhatre built trust with Plaintiff, describing her family's wealth, her philanthropic intentions, and her own success in cryptocurrency trading. She claimed to have made tens of millions of dollars through short-term trading based on information she received from her father and godfather.

33.     Around June 22, 2023, Defendant Mhatre introduced Plaintiff to sign up for Trust Wallet, a legitimate cryptocurrency wallet, and guided Plaintiff to an inner link ( https://coinrule-web3.net/) – purportedly an investment platform.   However, the link she provided to Plaintiff was not a legitimate platform but was instead a fraudulent website created to deceive individuals, including Plaintiff, into believing they were investing on a legitimate cryptocurrency exchange.

34.     To further entice Plaintiff into believing she was a legitimate investor who only wanted to assist Plaintiff in becoming a successful cryptocurrency trader like her, Defendant Mhatre deposited two hundred fifty dollars ($250.00) into the fraudulent website, coinrule-web3.net, on behalf of Plaintiff. Defendant Mhatre guided Plaintiff through several rounds of instantaneous investments which Plaintiff believed he profited from. Due to this, Plaintiff believed that Defendant Mhatre was a legitimate investor who wanted to help him learn how to invest cryptocurrency and further, that the fraudulent website he had used was also legitimate.

35.     On or about June 24, 2023, Defendant Mhatre provided Plaintiff with instructions—allegedly from her father—regarding how to fund further investments. Plaintiff was directed to wire funds from his Bank of America account to Payward

Ventures, Inc. (d/b/a Kraken), a legitimate U.S. cryptocurrency exchange, via MVP Bank, Inc. in West Virginia.

36.     In reliance of the representations from Defendant Mhatre, Plaintiff made four wire transfers to the specified account:

- $50,000.00 on June 26, 2023

- $150,000.00 on June 30, 2023

- $50,000.00 on July 11, 2023

- $2,000,000.00 on September 6, 2023

37.     Defendants posted fraudulent returns on their fake website which made it appear that Plaintiff was making money on his trades. As a result, he continued to transfer cryptocurrency from his Kraken account to the fraudulent exchange.

38.     Throughout this period, Defendant Mhatre continued to provide guidance and reassurance, referencing her father's and godfather's involvement, and the supposed safety and profitability of the investments. Plaintiff's Coinrule-web3.net account reflected significant "profits."

39.     Because of the fraudulent representations contained on the fake website, and misrepresentations made by Defendant Mhatre, Plaintiff believed that he had made significant money from his previous investments.

40.     Plaintiff believed he had made a considerable amount of money. In fact, Plaintiff was told by Defendant "1" that the value of his cryptocurrency had grown from approximately two million two hundred thirty thousand four hundred ten dollars and

eighteen cents ($2,230,410.18) to approximately ten million three hundred thousand dollars ($10,300,000.00), which was also reflected on the fraudulent website.

41.     On September 14, 2023, Plaintiff attempted to transfer approximately 400,000 USDT from the fraudulent website to his Coinbase account.  However, when he tried to convert the USDT to USD he was unable to do so.

42.     When Plaintiff questioned Defendant "1" about this issue, Defendant "1" claimed that Plaintiff had to pay taxes on the entire profit of his account prior to withdrawing funds.

43.     Plaintiff had a number of conversations with several different individuals who claimed to be customer service representatives who, like Defendant "1", attempted to convince Plaintiff to transfer additional cryptocurrency to pay taxes on $10,300,000 in fake "profits".

44.     Plaintiff became suspicious and stopped transferring any more funds to coinrule-web3.net.

45.     After multiple unsuccessful attempts to withdraw his funds, Plaintiff realized he had been scammed.

46.     Plaintiff contacted Defendant "1" to discuss his concerns.  One of the Skype conversations was recorded. Upon further inspection, it appears that Defendant "1" used either deep fake technology or a filter to disguise her true identity.

47.     Plaintiff questioned Coinbase as to why the 400,000 USDT could not be withdrawn to his bank account.  On or about October 14, 2023, Coinbase confirmed

that Plaintiff had been subjected to a sophisticated scam and would not be able to withdraw the funds to his bank account as the Tether (USDT) in his Coinbase account was unauthenticated (*i.e.*, counterfeit tokens).

48. Plaintiff's communications with "Anna Mhatre" continued into November 2023. She persisted in pressuring Plaintiff to pay the purported taxes, referencing her own "successful" withdrawals after paying taxes and reiterating her connections to her father and David Tepper. Plaintiff preserved text messages, emails, and screenshots of transaction records, including withdrawal attempts and the fraudulent dashboard's representations.

49. Plaintiff's account under Trust Wallet and the Coinrule-web3.net dashboard, as well as transaction records from Coinbase, document the flow of funds, the fraudulent representations, and the ultimate inability to recover the assets. Plaintiff's Kraken account was subsequently closed by the exchange for reasons that remain unclear.

50. All transactions and communications were conducted with the direct assistance and encouragement of "Anna Mhatre" (a/k/a "Anna Khalid") who, upon information and belief, was directed to defraud Plaintiff by her co-conspirators including Infiniweb and ITECHNO.

**B. Plaintiff's Forensic Tracing of Their Stolen Cryptocurrency**

51. When a transaction is made on the blockchain it is assigned a "transaction hash" ("TXID"). A transaction hash is a unique string of characters that is given to every

transaction that is verified and added to the blockchain. A TXID is used to uniquely identify a particular transaction. All on-chain transactions (the transactions from or to external addresses) have a unique TXID that can be seen in transaction details. All on-chain transactions (depositing and withdrawing of funds) have a unique TXID that can be found in transaction details.

52.     Within the time frame of June 27th, 2023, and September 7th, 2023, Plaintiff made 4 transactions from his Kraken account to the fraudulent exchange.  In total, Plaintiff transferred approximately 2,230,410.1801 Tether (USDT) to the fraudulent exchange, which has a market value of approximately two million two hundred thirty thousand four hundred ten dollars and eighteen cents ($2,230,410.18).

53.     As the tracing report shows, Defendant Mhatre with help of multiple co-conspirators opened numerous cryptocurrency wallets that, upon information and belief, are owned or controlled by ITECHNO and where laundered through a network of wallets by Defendant Mhatre who participated either voluntarily or through force to perpetrate the fraud and laundering of Plaintiff's stolen proceeds through the blockchain until the stolen assets reached various cryptocurrency wallets believed to be owned and controlled by Defendant Infiniweb and/or ITECHNO.

**C. Laundering Network and Involvement of Infiniweb and ITECHNO**

54.     The fraudulent scheme described above is consistent with the "pig butchering" (aka confidence scams) identified by the United States Department of Justice ("DOJ") and the United States Secret Service in the DOJ's Complaint, in which

criminal actors use fraudulent platforms, social engineering, and complex laundering networks to steal and conceal victim assets.

55.    In *United States of America v. Approximately 225,364,961 USDT*, Civil Action No. 25-cv-1907, the Department of Justice ("DOJ") detailed an investigation wherein the United States Secret Service traced the proceeds of pig butchering scams through a network of at least 144 OKX exchange accounts and hundreds of intermediary wallets. In the DOJ's Complaint, it details how cryptocurrency stolen from victims of the same scam perpetrated against the Plaintiff were laundered through intermediary wallets until they were ultimately consolidated into seven wallets on the OKX platform which were seized by the DOJ and hold over $225 million USDT. *See United States of America v. Approximately 225,364,961 USDT*, Civil Action No. 25-cv-1907, Verified Complaint for Forfeiture *In Rem* (Case No. 1:25-cv-01907, D.D.C.) attached as Exhibit A (hereinafter referred by its exhibit number or as "DOJ Complaint" at ¶¶ 15, 45-240.

56.    According to the DOJ's Complaint, "Law enforcement analyzed the transactional activity associated with the 144 OKX Accounts and observed over 263,000 deposit transactions that totaled about *three billion dollars* in transactions. Notably, 98% of these transactions were conducted between November 2022 and November 2023" – **the same period that Plaintiff was scammed.**  Exhibit A – DOJ Complaint at ¶ 65.

57.    Using the First In First Out (FIFO) method on the Lukka blockchain tracing platform, Plaintiff obtained an updated tracing of his stolen cryptocurrency.

13

Plaintiff's updated tracing using the FIFO method identified the network of wallets that were used by Defendants to steal and launder his cryptocurrency. Plaintiff has compared his updated tracing to the network of wallets identified in the DOJ Complaint, revealing that his stolen cryptocurrency was laundered through approximately 39 intermediary wallets, including the following:

0x891238b32df936c48a91adf74299adf2c80d32a7

0x11bd21e4451769cee296f1328e7d7fdaa41ac39e

0xbbb30a686d0fef817dc58ae03ee28b09ca3ef8fa

0x3a30f406d55399ba533697d7b50e5ba14bfad619

0x3d7eea656a95285669c06386d78ce53f02af0904

0xa6173a4128bb9adef4fbe4d858363fbcda23c089

0x3f76c558a700d7628024c542a695007bf1944d6a

0x609a28e9e20e87e6214db6b7a7f2528450b11419

0x78b4b28249e0d6c200b06196929012b24b42fa36

0xbcbb4c46119a4f96da73a874579c96f887d92229

0x232881f12095648b7b41598db1fbc8156420d091

0xe8ccf74e57e11788da2ae0980be8667ffd6314e0

0xb287544885a8480efd5a75108049ba43318299f0

0xa7409e71aba3d2b106946025157a3e0234404a92

0x9d3526812bb06bda91a4cbeb7a1422d37d41457b

0xe6d2db3e6a84bfd204ec905f8ac20c3efeb36d49

14

0x4655841e1cce8140aca4758623160d265eaf9ee6

0xb1e924d39c59adf80b2b3ddec0ade6d05f51e0ed

0xc79b5817b4d476bb2c66d4af3bf58b18efaa4469

0x809fd328a45d5190a0279fee0ab46dddcb6501d3

0x116fa266bee85f656b4234b1f69dc79a4b02b421

0x13c09d20b61f3543a5b351891c3b6ed7d05dd218

0x69053a15b763e6094ca68f7c14cd5f72926516e7

0xe6dff60c1a525a90108f4381cab19c65a08f91f0

0x5a09463efb8dd50f87564c695effa45c48657767

0x6672ea63f31dc64ce1db77a31e94aa76a1183d55

0x90b3160621e88cf6657172988f5b8076f4de6fd7

0xd3bc74cc8991e4104dde041048b4455488f1d83e

0x5bc0b42f9086c8049557e7af5f93b746fbd9bd19

0xced0d7d15d62466fa78a457af7563d459c1b41bc

0xff921baa016ddc4103ca57ae790d473d191e7188

0xa7eeeae38f08d53b201433267083404375af1341

0xcc7afdd3da926657af496d73437c65c792cbc4ba

0x07e5d2ecd65ca3a34da63cf0b0a00f57728e75b1

0x7f3c82e892616d4d5a325fa13e4f4d04a8d312ce

0x529b1e9f3f96409c46793f00e40bca8124f228d6

0xb1a54996329d20fc3560215b95dce23a53837357

0x647b4762d9be433ea13b626aa741bbf75db04356

0x8b924b87abbc19e98ab701056ef1cc896f680a34

58.     These same wallets were also used to launder the criminal proceeds that were ultimately seized by the DOJ. *See* Exhibit A - DOJ Complaint, Exhibits 4-9, 11-14, 16 and 22.

59.     Thus, Plaintiff was scammed by the same type of scam, during the same relevant period described in the DOJ's Complaint of November 2022 through November 2023, and his stolen cryptocurrency was laundered through some of the same wallets that were also used by the perpetrators in the DOJ's action.

60.     The DOJ's Verified Complaint and supporting evidence identify Infiniweb as the owner of five of the seized wallets.  *Id*. at ¶ 240.

61.     Infiniweb has appeared in the DOJ's forfeiture action and filed a Verified Claim asserting an interest in all 7 of the seized OKX wallets.  *See* Exhibit B – Infiniweb Technology, Inc.'s Verified Claim.

62.     Infiniweb is an online gaming/gambling company with "close links with Xionwei Technologies, which is accused of being involved in kidnapping and human trafficking. The accusations of kidnapping and human trafficking were outlined in a 120-page report from 2023, submitted to the nineteenth congress of the Republic of the Philippines." *See* Exhibit A - DOJ Complaint at ¶ 240. (quoting Philippe Auclair, Andy Brown, Jack Kerr, Samindra Kunti, Steve Menary, *Meet the hydras*: *tracing the illegal*

*gambling operators that sponsor football*).[6] According to the DOJ's Complaint, "Infiniweb was also listed on a 'LIST OF CANCELLED OFFSHORE GAMING LICENSEES,' appearing to be dated January 15, 2024, posted by the Philippine Amusement and Gaming Corporation." *Id*. (*Citing* Philippine Amusement and Gaming Corporation, List Of Cancelled Offshore Gaming Licensees)).[7]

63.    The DOJ's investigation further identifies ITECHNO as a key participant in the scam and laundering operation.

64.    In the DOJ's Complaint, "[a]ll 144 OKX Accounts are believed to be controlled by a group of cryptocurrency confidence scam actors and/or their money laundering co-conspirators." *Id*. at ¶ 47. According to the DOJ, many of the subject OKX Accounts were opened by employees of ITECHNO. *See e.g.*, *id*. at ¶¶ 45-66. ITECHNO operated out of a scam compound in the Philippines, likely employing forced labor to perpetrate cryptocurrency pig butchering scams and launder victim funds. *Id*.

65.    The movement of Plaintiff's stolen assets through some of the same intermediary wallets identified by the DOJ to launder the assets to wallets owned or

---

[6] https://www.playthegame.org/news/meet-the-hydras-tracing-the-illegal-gambling-operators-that-sponsor-football/ (Jan. 30, 2024).

[7] https://www.pagcor.ph/regulatory/pdf/offshore/list-of-cancelled-offshore-gaming-licensees.pdf (Jan. 15, 2024)

controlled by ITECHNO which, per the DOJ's Complaint, were eventually transferred to the seven wallets owned by Infiniweb provides strong evidence of ITECHNO and Infiniweb's involvement in the theft and laundering of Plaintiff's cryptocurrency.

66. Plaintiff incorporates by reference the DOJ's Verified Complaint for Forfeiture *In Rem*, the exhibits thereto, and Plaintiff's own tracing analysis, and will rely on these findings to establish the relationship between the newly added defendants and the theft and laundering of Plaintiff's cryptocurrency.

**COUNT I**
**RACKETERING IN VIOLATION OF 18 U.S.C. § 1964**

67. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

68. At all relevant times, Defendants—including Anna Mhatre, Infiniweb and ITECHNO—constituted an "enterprise" within the meaning of 18 U.S.C. § 1961(4), associated in fact for the common purpose of executing a global cryptocurrency fraud and money laundering scheme.

69. The operation of Defendant Mhatre, Infiniweb and ITECHNO, individually and through their alleged businesses including their fraudulent cryptocurrency trading and use of online gambling platforms to laundering criminal proceeds constitutes a racketeering operation.

70. Infiniweb and ITECHNO directed and coordinated with each other and with Defendant Mhatre (and potentially other unidentified co-conspirators) ("RICO Enterprise," or "Enterprise") within the meaning of 18 U.S.C. § 1964(4), which

Enterprise was engaged in, or the affairs of which affected, interstate and foreign commerce.

71. Infiniweb, ITECHNO, and Defendant Mhatre were each also a member of the RICO Enterprise, as each was a distinct person, separate and apart, from each of the RICO Enterprise members together.

72. Defendants, individually and collectively, conducted or participated, directly or indirectly, in the conduct of the affairs of the RICO Enterprise through a pattern of racketeering activity, as described above.

73. Each person's participation was effective partly because each mimicked an actual on-going business (including the fraudulent platform coinrule-web3.net) with a presence in the marketplace: the United States and indeed worldwide. Upon information and belief, Infiniweb used its online gambling business, which had a presence within the marketplace, to further launder the illicit proceeds into the worldwide economy.

74. As co-conspirators, the unlawful conduct of each member of the RICO Enterprise is attributed to every member.

75. The pattern of racketeering activity included, but was not limited to, multiple acts of wire fraud (18 U.S.C. § 1343), conspiracy to commit wire fraud (18 U.S.C. § 1349), money laundering (18 U.S.C. § 1956(a)(1)(B)(i)), and conspiracy to commit money laundering (18 U.S.C. § 1956(h)), all in violation of 18 U.S.C. § 1962(c).

76. The predicate acts set forth in this Amended Complaint include defrauding

19

Plaintiff beginning in June 2023, through domestic and international communication including LinkedIn and WhatsApp messaging, WhatsApp and Skype video calls, domestic and international in-app communication, and e-mails with Plaintiff and then laundering the criminal proceeds through the blockchain and ultimately into Infiniweb's online gambling business operation.

77. The predicate acts set forth in this Complaint are related, in that they have the same or similar purposes, results, participants, and methods of commission, and are otherwise interrelated by distinguishing characteristics and are not isolated events. The related criminal schemes set forth in this Amended Complaint constitutes a "pattern or patterns of racketeering activity" as defined in 18 U.S.C. § 1961(5).

78. The Defendants engaged in two or more predicated acts of racketeering within a period of ten years and committed at least one such act after October 15, 1970.

79. The information that would establish further predicate acts and further acts of racketeering is solely within the control of Defendants. Plaintiff requires discovery to ferret out the further extent of predicate acts and further acts of racketeering, including the identity of similarly situated defrauded victims and the scope of the systematic fraud.

80. Defendants have received income derived, directly or indirectly, from a pattern of racketeering activity and used or invested, directly or indirectly, part of such income, or the proceeds of such income, in acquisition of an interest in, or in the establishment or operation of, the RICO Enterprise, an enterprise which is engaged in,

or the activities of which affect, interstate or foreign commerce in violation of 18 U.S.C. § 1962(a).

81.    The RICO Enterprise's activities affected interstate and foreign commerce, as the scheme targeted victims in the United States (including California), utilized U.S.-based and foreign cryptocurrency exchanges, and involved the movement of assets across national boundaries.

82.    As a direct and proximate result of Defendants' violations of 18 U.S.C. § 1962(c), Plaintiff has suffered damages.

**WHEREFORE,** Plaintiff demands that judgment be entered against each Defendant, jointly and severally, as follows:

    (a)    damages;

    (b)    statutory trebled damages pursuant to 18 U.S.C. § 1964(c);

    (c)    punitive damages;

    (d)    costs, including reasonable attorney's fees, pursuant to 18 U.S.C. § 1964(c);

    (e)    costs;

    (f)    interest; and

    (g)    such other and further relief as this Court deems just and proper.

**COUNT II**
**FRAUD**

83.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

84. Beginning on or about May 30, 2023, Defendant Anna Mhatre a/k/a Anna Khalid ("Mhatre"), acting individually and in concert with Infiniweb and ITECHNO, knowingly and intentionally engaged in a scheme to defraud Plaintiff Edmond Rambod.

85. The fraudulent scheme was initiated when Mhatre contacted Plaintiff via LinkedIn, using the alias Anna Mhatre (initially Anna Khalid but changed her name to Mhatre) and subsequently provided her cell phone number, email address, and a physical address in Chicago, Illinois. Mhatre represented herself as the daughter of wealthy parents, with connections to a prominent hedge fund manager, and claimed access to exclusive, inside information for cryptocurrency trading.

86. Between June and September 2023, Mhatre, through repeated communications via LinkedIn, WhatsApp, email, and Skype, induced Plaintiff to invest in cryptocurrency by making the following false and material representations:

a. That she was a successful cryptocurrency trader with access to inside information and a network of professional trading experts;

b. That Plaintiff's investments would be managed through a legitimate platform ("Trust Wallet") and a proprietary trading dashboard ("Coinrule-web3.net");

c. That Plaintiff's funds would be safe, secure, and would generate substantial profits with minimal risk; and

d. That Mhatre and her associates had previously made and withdrawn large profits using the same methods and platforms.

87.    In reliance on these representations, Plaintiff transferred funds on four occasions from his Bank of America account to Payward Ventures, Inc. (Kraken), totaling $2,250,000, which were then converted to USDT and deposited into the fraudulent Coinrule-web3.net platform at Mhatre's direction.

88.    After Plaintiff's investments appeared to generate significant profits on the Coinrule-web3.net dashboard, Defendant Mhatre and purported "customer service" representatives falsely informed Plaintiff that he could not withdraw his funds unless he first made a large deposit to pay "taxes" on the purported profits.

89.    These representations were knowingly false when made. The Coinrule-web3.net platform was a sham, the profits displayed were fictitious, and the demand for tax payments was a further attempt to extract additional funds from Plaintiff.

90.    Infiniweb and ITECHNO, as participants in the laundering network identified by the United States Department of Justice, knowingly received, concealed, and laundered Plaintiff's stolen assets through wallets and accounts under their control, as detailed in the DOJ's Complaint.

91.    The specific acts of fraud include, but are not limited to:

- Defendant Mhatre's initial and ongoing communications with Plaintiff (May–November 2023), including the provision of false personal and financial information;

23

- The creation and operation of the fraudulent Coinrule-web3.net platform;

- The orchestration of wire transfers and cryptocurrency purchases under false pretenses;

- The fabrication of account balances and profits to induce further investment;

- The demand for a large crypto deposit to pay "taxes" as a condition for withdrawal; and

- The laundering of Plaintiff's stolen assets through wallets controlled by Infiniweb and ITECHNO.

92. Plaintiff reasonably and justifiably relied on Defendants' false statements and omissions, which were made with the intent to induce Plaintiff's reliance and to deprive Plaintiff of his assets.

93. As a direct and proximate result of Defendants' fraudulent conduct, Plaintiff suffered damages including the loss of at least $2,230,410.18 in cryptocurrency, loss of use of those assets, and consequential damages.

94. Plaintiff is entitled to recover actual damages, punitive damages, interest, costs, and such other relief as the Court deems just and proper.

**COUNT III**
**CONVERSION**

95. Through fraudulent misrepresentations, Defendants convinced Plaintiff to invest his money into cryptocurrency.

96. Defendants then convinced Plaintiff to transfer his cryptocurrency to fake

exchanges owned and operated by Defendants.

97.   After Plaintiff transferred his cryptocurrency assets to the fake platform, Defendants then transferred Plaintiff's cryptocurrency to cryptocurrency addresses owned or controlled by Defendant Mhatre, ITECHNO and Infiniweb.

98.   Plaintiff owned and had a right to possess the cryptocurrency.

99.   Defendants substantially interfered with the cryptocurrency by knowingly or intentionally misappropriating the funds and taking possession of the cryptocurrency, preventing Plaintiff from having access to the cryptocurrency.

100.   Defendants have refused to return Plaintiff's cryptocurrency after Plaintiff demanded its return on multiple occasions.

101.   Defendants did not have Plaintiff's consent to convert Plaintiff's funds to their own use or to the use of others not entitled thereto and have exercised dominion and control over the funds to Plaintiff's exclusion and detriment.

102.   Defendant's conduct was a substantial factor in causing Plaintiff harm.

103.   As a direct and proximate result of Defendants' conversion and conduct, Plaintiff has suffered damages.

**WHEREFORE**, Plaintiff demands that judgment be entered against all Defendants, jointly and severally, for damages, interest, costs, and such other and further relief as this Court deems just and proper.

## COUNT IV
## UNJUST ENRICHMENT

104. Defendants received a direct benefit at Plaintiff's expense by fraudulently convincing Plaintiff to transfer valuable cryptocurrency that Defendants converted from Plaintiff. Defendants have knowledge of the benefit Plaintiff conferred upon them and have retained such benefit.

105. The circumstances under which Plaintiff conferred and Defendants accepted, render Defendants' retention of the benefits inequitable.

106. Equity required that Defendants return to Plaintiff the benefits he conferred upon Defendants.

**WHEREFORE**, Plaintiff demands that judgment be entered against all Defendants, jointly and severally, for damages, interest, costs, and such other further relief as this Court deems just and proper.

## COUNT V
## CONSPIRACY

107. The Defendants conspired and confederated with each other to commit, and committed, Fraud (Count II); Conversion (Count III); and Unjust Enrichment (Count IV).

108. Plaintiff was harmed by Defendant's wrongful acts of conversion, RICO violations, and unjust enrichment. Relying on the false statements made by Defendant Mhatre, including that she was an expert in cryptocurrency investments, Plaintiff transferred his cryptocurrency assets to a fake cryptocurrency platform which were

actually deposit addresses owned or controlled by Defendants.

109. Defendants conspired with others via the fraudulent website coinrule-web3.net and WhatsApp where they communicated with Plaintiff. Defendants are the owners or exercise control over the cryptocurrency deposit addresses where Plaintiff's stolen cryptocurrency was transferred.

110. As a result, Plaintiff has suffered damages as a direct and proximate result of Defendants' conspiracy.

111. Defendants are responsible for the harm caused by such wrongful acts because they each were part of a conspiracy to commit such violations.

112. Defendants each entered into an agreement to commit such wrongful acts.

113. Defendants were aware that each co-conspirator planned to commit such wrongful acts.

114. Defendants each agree with one another and intended that the wrongful acts be committed.

**WHEREFORE**, Plaintiff demands that judgment be entered against all Defendants, jointly and severally, for damages, interest, costs, and such other and further relief as this Court deems just and proper.

## <u>DEMAND FOR A JURY TRIAL</u>

Plaintiff demands trial by jury on all issues so triable.

Dated: Nov. 4, 2025                    Respectfully Submitted,

By:          */s/ Daniel J. Thornburgh*

Daniel J. Thornburgh, Esq.
AYLSTOCK, WITKIN, KREIS &
OVERHOLTZ, PLLC
17 East Main Street, Suite 200
Pensacola, FL 32502
Telephone: 850-202-1010
Fax: 850-916-7449
dthornburgh@awkolaw.com

-and-

Kiley L. Grombacher
Bradley Grombacher, LLP
31365 Oak Crest Drive, Suite 240
Westlake Village, CA  91361
Kgrombacher@bradleygrombacher.com
Telephone:  805-270-7100
Facsimile:  805-270-7589

*Counsel for Plaintiff, Edmond Rambod*